IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PATRICK CRONIN, | : |
| *Plaintiff*, | : Case No. 1:19-cv-758 |
| vs. | : Judge Jeffery P. Hopkins |
| KAIVAC, INC., | : |
| *Defendant*. | : |

**OPINION AND ORDER**

Plaintiff Patrick Cronin ("Plaintiff" or "Cronin"), a contract consultant, entered into a Consulting Agreement with Defendant Kaivac, Inc. ("Defendant" or "Kaivac"), a company that designs, manufactures, and sells specialized cleaning equipment. The Consulting Agreement entitled Cronin to commissions on Kaivac's sales to certain accounts up to a year after the Consulting Agreement's termination. When Kaivac made a major sale to one of those accounts, Walmart, after the Consulting Agreement's termination, Cronin sued.

Cronin originally asserted claims for breach of contract, promissory estoppel, unjust enrichment, and failure to pay sales commissions under Ohio Revised Code § 1335.11, *see* Compl., Doc. 1, ¶¶ 62–86, but Cronin later voluntarily dismissed his promissory estoppel and unjust enrichment claims. Doc. 13, PageID 174. Kaivac now seeks summary judgment on Cronin's claims for breach of contract and unpaid sales commissions. Doc. 41. Also before the Court is Cronin's request to file a sur-reply. Doc. 52. For the reasons below, the Court **DENIES** Cronin's Motion for Leave to File a Sur-Reply (Doc. 52) and **GRANTS** Kaivac's Motion for Summary Judgment (Doc. 41).

I.   **BACKGROUND**[1]

   **A. Cronin's Consulting Agreement.**

On July 15, 2015, Cronin entered into a Consulting Agreement with Kaivac, a company that designs, manufactures, and sells specialized cleaning equipment. Doc 11-1, PageID 152–53; Doc. 7-1, PageID 46; Doc. 1-1, PageID 12, 16. Kaivac hired Cronin as an independent contractor to introduce Kaivac to national industry organizations through his network of corporate contacts. Doc. 7-1, PageID 46. After Cronin made the introductions, Kaivac's sales personnel would then solicit the sales for Kaivac products. *Id.*

The Consulting Agreement provided that Kaivac would pay Cronin "the compensation specified in Schedule A[.]" Doc. 1-1, PageID 14. Pursuant to Schedule A, Cronin was paid "$2,000 per month for a period of six (6) months" and:

> Commission of 4% of net sales (defined as gross sales less freight costs, sales taxes, customs fees or other similar costs paid by [Kaivac]) paid monthly for the six-month term of this agreement and up to twelve (12) months following the termination of the agreement on accounts assigned to [Cronin] and for which designated goals were achieved by [Cronin].

---

[1] At the time the Motions were briefed, this case was assigned to the Honorable Matthew W. McFarland. Judge McFarland's Standing Order requires summary judgment movants to attach proposed undisputed facts setting forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. Every brief in opposition to a motion for summary judgment must attach a response to the movant's proposed undisputed facts, which states, in separately numbered paragraphs corresponding to the proposed undisputed facts, whether each of the facts asserted by the moving party is admitted or denied. Each statement of material fact or response thereto "must be followed by a specific citation or citations to (1) the affidavit of a witness competent to testify as to the facts at trial, (2) a sworn deposition, and/or (3) other evidence, including documentary evidence, that would be admissible at trial." Standing Order § B.1; *see also* Fed. R. Civ. P. 56(c).

Kaivac attached proposed undisputed facts to its Motion for Summary Judgment. Doc. 41-1. While Cronin's response to Kaivac's proposed undisputed facts (Doc. 48-1) is largely compliant with the Standing Order's requirements, he denies several of Kaivac's asserted material facts without including a citation to the record. Similarly, Cronin filed his own proposed undisputed facts that include a number of factual assertions without any citation to the record. In reaching its findings of fact, the Court will disregard any such unsupported denial or factual assertion. *See Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010) ("A district court has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (citations omitted).

Doc. 1-1, PageID 17. Although the Consulting Agreement expired on January 15, 2016, both Kaivac and Cronin continued to perform according to its terms. Doc. 7-1, PageID 47.

Kaivac ended its consulting relationship with Cronin on August 3, 2016. *Id.* at PageID 47; Doc. 7-2, PageID 53; Doc. 11-1, PageID 152. Kaivac told Cronin that it would pay him commissions on approved accounts for the next twelve months, through August 3, 2017. Doc. 7-1, PageID 47; Doc. 7-2, PageID 53; Doc. 7-3, PageID 56–57. Cronin agreed that he was owed commissions on "all machine orders that are in your possession (Kaivac) as of 11:59:59 August 3rd – 2017." Doc. 7-2, PageID 53.

### B. Kaivac's Deal with Walmart.

One of the products Kaivac sells is the Omniflex SUV crossover cleaning system ("Omniflex"). Doc. 7-1, PageID 47. As part of Cronin's consulting work for Kaivac, Cronin assisted Kaivac in its efforts to sell the Omniflex to Walmart. Doc. 11-1, PageID 152.

#### i. Kaivac and Walmart negotiated for Walmart's purchase of the Omniflex.

Throughout 2016 and 2017, Kaivac and Walmart had ongoing negotiations about Walmart potentially ordering Omniflex machines for several of its stores. Doc. 7-1, PageID 48–50; Doc. 40, PageID 329. In order to qualify to possibly sell products to Walmart, Kaivac entered into a Supplier Agreement with Walmart that governed "all sales and deliveries of Goods" by Kaivac to Walmart and all purchase orders issued by Walmart. Doc. 48-11, PageID 892, 894. The Supplier Agreement defined "Order" as "Purchase Order" and provided that the "Order sets forth the entire agreement between [Kaivac] and [Walmart] with respect to the sale and purchase of the Goods" and that "[a]cceptance of an Order may be made only by shipment of the Goods." *Id.* at PageID 913. The Supplier Agreement

3

contained a cancellation provision that says Walmart "may cancel all or any part of an Order at any time prior to shipment." Doc. 48-11, PageID 916.

In deciding whether to approve Kaivac as a vendor, Walmart required test Omniflex units to generate testing data to present to Walmart's capital committee. Doc. 40, PageID 327; *see also* Doc. 7-1, PageID 48. Walmart's capital committee decides whether to approve the budget for significant purchases; there could be no purchase order for a vendor's products without such a budget. Doc. 40, PageID 328, 336–37. Pamela Woods, a former Walmart employee who purchased equipment for Walmart stores, testified that a vendor does not have an order from Walmart until Walmart has issued a purchase order. *Id.* at PageID 338.

Walmart conducted an initial round of testing on 17 Omniflex machines and then, in early 2017, Walmart ordered an additional 30 test Omniflex machines to continue its vendor evaluation for Kaivac.[2] Doc. 40, PageID 327–28; *see also* Doc. 7-1, PageID 48.

On May 23, 2017, Walmart requested draft designs of a customized Omniflex unit in "Walmart blue" with Walmart's spark logo. Doc. 48-11, PageID 937. Kaivac provided customized Omniflex designs and received positive feedback from Walmart. Doc. 48-11, PageID 944.

If Walmart placed an order for the Omniflex machines, Walmart expected Kaivac would fill the order over the course of several months. Doc. 7-1, PageID 48. In order to meet Walmart's desired delivery schedule for the customized Omniflex machines, Kaivac needed to "pre-order items including 500 batteries and 500 sets of custom blue tanks." Doc. 48-11,

---

[2] Kaivac paid Cronin sales commissions for the test units. Doc. 7-1, PageID 48.

PageID 929. On June 16, 2017, Kaivac's VP of Sales, Bob Robison, Jr., requested a conversation between Walmart and Kaivac's President, Bob Robinson, Sr., explaining that:

> [Mr. Robinson, Sr.,] is looking for a vote of confidence and would like to have a conversation with Davin regarding this project. We are being asked to pre-buy with no guarantee's, and the blue tanks are what is the biggest issue for him. By having a conversation with Davin and hearing his level of excitement and commitment to seeing this project come to fruition, I think he would be more inclined to pull the trigger on pre-ordering vs. me in his ear. Otherwise, he is going to want to make the first 500 units in stock color black until the blue tanks come in.

Doc. 48-11, PageID 929.

### ii. Kaivac requested to increase its line of credit to finance its deal with Walmart.

To finance the potential Walmart deal, Kaivac met with its lending partner Fifth Third Bank on July 19, 2017, to discuss an increase on Kaivac's line of credit. Doc. 42-6, PageID 456. Following that meeting, Kaivac's relationship manager at Fifth Third wrote to Kaivac that "I know you alluded to the fact that Wal-Mart will not be locked into a contractual obligation with you to buy the full 3,900 of each the SUVs, cooler cleaners and spare batteries from the start, and that the purchase orders will be the only method of contract per se." *Id.* at PageID 457. On July 21, 2017, Kaivac provided Fifth Third with a written narrative of its potential deal with Walmart that stated "[t]he biggest risk factor Kaivac faces with this purchase would be Walmart prematurely cancelling the purchase schedule early into the schedule, leaving Kaivac with high inventory levels." Doc. 48-11, PageID 972. Kaivac told Fifth Third this risk stemmed from its Supplier Agreement with Walmart that allowed Walmart to cancel an order any time before the shipment of products. Doc. 42-5, PageID 450. On August 22, 2017, Fifth Third was still waiting on "official word" that Walmart had "signed off on the order" in order to increase Kaivac's line of credit. Doc. 42-7, PageID 460.

### iii. Walmart's capital committee approved the budget for Walmart's purchase of the Omniflex.

On August 25, 2017, Walmart notified Kaivac that the capital committee had approved the budget for 3,900 Omniflex machines.[3] Doc. 7-1, PageID 49–50; Doc. 7-6, PageID 124; Doc. 7-7, PageID 127. That same day, Fifth Third sent Kaivac the executed loan documents for the increased line of credit. Doc. 42-14, PageID 574–75. On September 1, 2017, Walmart issued purchase orders to Kaivac for 3,900 Omniflex machines. Doc. 7-4, PageID 59–118. Kaivac then shipped large quantities of Omniflex machines to Walmart each month from September 2017 through January 2018 until the orders were filled. Doc. 7-1, PageID 50.

## II. MOTION FOR LEAVE TO FILE A SUR-REPLY

The Court will turn first to Cronin's request to file a sur-reply. Kaivac opposes that request. The Local Rules prohibit "additional memoranda beyond those enumerated ... except upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2); *De Angelis v. Nat'l Ent. Grp. LLC*, No. 2:17-cv-924, 2:17-cv-926, 2:17-cv-927, 2:18-cv-443, 2019 WL 1024954, at *2 (S.D. Ohio Mar. 4, 2019). While the Local Rules do not define good cause, "this Court has consistently held that in order for a party to be given permission to file a sur-reply, the reply brief must raise new grounds that were not presented as part of the movant's

---

[3] Walmart also notified Kaivac on August 25, 2017 that Kaivac would receive orders for "420 cooler cleaners for Sam's Club." Doc. 42-13, PageID 572. To the extent Cronin claims Kaivac owes him commission for the cooler cleaner sales in addition to the Omniflex machine sales, it is unclear whether his Consulting Agreement entitled him to sales to Sam's Club. Although Cronin describes Sam's Club as Walmart's "sister company," Ms. Woods testified that "Wal-Mart and Sam's are not one entity, so it's a separate budget, a separate division." Doc. 40, PageID 340. Even assuming without deciding that Cronin's Consulting Agreement entitled him to commission for Kaivac's sales to Sam's Club within the one-year tail period, his claims fail as to the cooler cleaners for the same reasons his claims fail as to the Omniflex machines discussed herein.

initial motion." *De Angelis*, 2019 WL 1024954, at *2 (citing *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 2:07-cv-1190, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010)).

Cronin argues that he should be granted leave to file a sur-reply because Kaivac's Reply: (1) "relied on the cancellation provision in the [Supplier Agreement] with Walmart which brings up the legal issue of whether the [Supplier Agreement] has any effect on the contract between [Cronin] and [Kaivac]"; (2) mischaracterized Cronin's "pleadings and prior statements" and the Court's decision denying Kaivac's Motion to Dismiss; and (3) introduces "new evidence" in the form of an email between Kaivac's general counsel and Fifth Third. Doc. 52, PageID 1037–38. None of these arguments are persuasive.

First, Cronin raised the issue of the Supplier Agreement's cancellation provision in his Response. *See* Doc. 48, PageID 782–83. Kaivac's Reply provided counterpoints to Cronin's arguments regarding the cancellation provision. This is the purpose of a reply brief and is no reason for filing a sur-reply. In any event, Cronin conceded that the Supplier Agreement "does not guarantee you will sell anything to Walmart[,]" and thus is not the basis for his claim. Doc. 48, PageID 776.

Second, to the extent Kaivac may have mischaracterized Cronin's statements or the Court's prior rulings, "[i]t is not the function of a surreply, but the function of the Court to 'determine whether the parties before it have accurately presented the facts, the opposing parties' arguments, and the applicable propositions of law, or whether the parties have mischaracterized the facts, arguments, and legal propositions.'" *Kondash v. Kia Motors Am., Inc.*, No. 1:15-CV-506, 2019 WL 7820563, at *2 (S.D. Ohio Dec. 16, 2019) (quoting *Aerpio Pharms., Inc. v. Quaggin*, No. 1:18-cv-794, 2019 WL 4717477, at *7 (S.D. Ohio Sept. 26, 2019)).

7

Finally, none of the emails between Fifth Third and Kaivac's general counsel referenced in Kaivac's Reply are new evidence—they are part of the record. *See* Docs. 42-5, 42-6.

Accordingly, Cronin's Motion for Leave to File a Sur-Reply is **DENIED**.

## III. MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

Kaivac seeks summary judgment on all remaining claims. Doc. 41. As the party seeking summary judgment, Kaivac "'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Cronin, however, as the non-moving party, cannot defeat summary judgment merely by pointing to any factual dispute. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

After reviewing the evidence before it, the Court must determine whether there is some "sufficient disagreement" about material facts that demands submitting the matter to a jury. *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in

the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "[i]n arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party," here, Cronin. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## B. LAW AND ANALYSIS

Cronin alleges that Kaivac breached the Consulting Agreement and violated Ohio Rev. Code § 1335.11 by failing to pay him sales commissions for Kaivac's sale of the 3,900 Omniflex machines (the "Omniflex Sale"). For his breach of contract claim to find support under Ohio law,[4] Cronin must show: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff because of the breach. *Mitchell v. Fujitec Am., Inc.*, No. 1:20-CV-363, 2022 WL 836424, *8 (S.D. Ohio Mar. 21, 2022) (quoting *Johnson v. Delphi Corp.*, 261 F. Supp. 2d 955, 961 (S.D. Ohio 2003)). For his claim for unpaid sales commissions under Ohio law to stand, he must show Kaivac failed to "pay [him] all commissions … that bec[a]me due after the termination within thirteen days of the date on which the commissions bec[a]me due." Ohio Rev. Code § 1335.11(C).

The Consulting Agreement provided that Cronin would receive commission of "net sales (defined as gross sales less freight costs, sales taxes, custom fees or other similar costs paid by [Kaivac])" for "up to twelve (12) months following the terminations of the agreement on accounts assigned to [Cronin]". Doc. 1-1, PageID 17. The parties agree that Cronin was

---

[4] The Court may exercise jurisdiction over this matter on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332. "Federal courts apply the substantive law of the forum state...." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009). The Consulting Agreement provides that it will be governed by Ohio law. Doc. 1-1, PageID 17. Without specific reference to the Consulting Agreement, both parties apply Ohio law in their briefings. Accordingly, the Court will apply Ohio law to the Consulting Agreement.

9

owed commissions only through August 3, 2017, but dispute whether the Omniflex Sale occurred before or after that date.

### i. The Omniflex Sale occurred when Walmart and Kaivac formed a contract for the Omniflex Sale.

Cronin contends that the "sale" occurred at the moment when Walmart formed a contract with Kaivac for the purchase of the Omniflex machines. Doc. 48, PageID 776–77. Kaivac does not dispute this interpretation, but disputes when the contract with Walmart was formed. Because the parties have not expressly defined "sale" in the Consulting Agreement, the Court looks to the term's ordinary meaning. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978). A "sale" is generally a transfer of title to or possession of property for an agreed upon price, or the agreement by which such a transfer takes place. *See* Sale, Black's Law Dictionary (12th ed. 2024); *see also* Ohio Rev. Code § 1302.01(A)(11). Under this definition, the Omniflex Sale occurred when Walmart agreed to purchase the Omniflex machines from Kaivac.

As the Court stated in its Order denying Kaivac's Motion to Dismiss, Cronin's claims are therefore "solved by answering one question: When did Walmart commit to ordering from Kaivac the Omniflex machines delivered in September 2017 and after?" Doc. 13, PageID 175. If Walmart contracted with Kaivac for the Omniflex machines *before* August 3, 2017, Cronin's claims succeed. If Walmart contracted with Kaivac for the Omniflex machines *after* that date, his claims fail.

### ii. Walmart contracted with Kaivac for the Omniflex machines after August 3, 2017.

The essential components of a contract include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of

10

mutual assent and legality of object and of consideration." *Williams v. Ormsby*, 966 N.E.2d 255, 258 (Ohio 2012) (internal quotation and citation omitted).[5] Kaivac argues that the contract for the Omniflex Sale was formed when Walmart issued the purchase orders on September 1, 2017. Cronin counters that Walmart contracted with Kaivac for the Omniflex Sale at some time before August 3, 2017, and points to various events that he contends demonstrate Walmart and Kaivac had a binding agreement, including Walmart's requests for additional testing and custom parts and Kaivac's request for an increased line of credit from Fifth Third.

Based on the record before the Court, no reasonable jury could conclude that Kaivac formed a contract with Walmart for the Omniflex Sale before August 3, 2017. Although Walmart and Kaivac's negotiations for the Omniflex Sale occurred before August 3, Cronin offers no evidence of Walmart and Kaivac's mutual assent before that date. To the contrary, it is undisputed that Walmart's capital committee did not approve the budget for the Omniflex Sale until August 25, 2017, some twenty-two days after August 3. Until that point, Walmart's capital committee could deny budgetary approval for the Omniflex Sale. And the evidence demonstrates that Walmart then issued the purchase orders for the 3,900 Omniflex machines on September 1, 2017 and Kaivac began filling the orders after that date. Thus, the evidence

---

[5] Although the parties cite to Ohio law in their arguments on contract formation between Walmart and Kaivac, the Court notes that the Supplier Agreement provides that Arkansas law shall govern disputes between Kaivac and Walmart related to sales. Doc. 48-11, PageID 904. In Arkansas, the essential elements of a contract are: (1) competent parties; (2) subject matter; (3) consideration; (4) mutual agreement; and (5) mutual obligations. *Jorja Trading, Inc. v. Willis*, 2020 Ark. 133, at 4, 598 S.W.3d 1, 5. Since neither party argues that Arkansas law governs the issue of contract formation between Kaivac and Walmart for the Omniflex Sale and both Arkansas and Ohio law require the same essential components for contract formation, the Court need not perform a choice of law analysis. *See Monroe v. Novartis Pharms. Corp.*, 29 F. Supp. 3d 1115, 1129 (S.D. Ohio 2014) (holding that a choice of law analysis is not required when the laws of jurisdictions are identical or would produce identical results).

11

supports only one conclusion: the contract for the Omniflex Sale was formed after August 3, 2017.

This conclusion is reinforced by the plain and ordinary meaning of the Supplier Agreement between Walmart and Kaivac. As stated above, the Supplier Agreement provided that Walmart's purchase order "sets forth the entire agreement between [Kaivac] and [Walmart] with respect to the sale and purchase of the Goods" and that "[a]cceptance of an Order may be made only by shipment of the Goods." Doc. 48-11, PageID 913. Both Walmart's issuance of the purchase orders for the Omniflex Sale and Kaivac's shipment of the Omniflex machines occurred after August 3, 2017. Thus, under the Supplier Agreement, both Walmart's offer and Kaivac's acceptance for the Omniflex Sale occurred after August 3, 2017.

Accordingly, a reasonable jury could only conclude that Kaivac's contract with Walmart for the Omniflex Sale was formed after August 3, 2017, and, therefore, Cronin is not entitled to sales commissions for the Omniflex Sale.

### iii. Cronin's arguments to the contrary fail.

Cronin points to various "milestones" that he argues demonstrate that Walmart and Kaivac formed a binding agreement for the Omniflex Sale before August 3, 2017: (1) Walmart's requests for additional testing in May 2017; (2) Walmart's request for custom parts between May and June 2017; and (3) Kaivac's request for an increased line of credit in July 2017. None of his arguments are persuasive.

First, he contends that Walmart committed to the Omniflex Sale "as early as May 26, 2017, when Walmart decided to require additional testing before budgeting to purchase units for each store to assess the labor savings." Doc. 48, PageID 778. But Ms. Woods testified that

it was "not true" that Walmart "would not have bought any test machines without first making a commitment to buy more[.]" Doc. 40, PageID 337. Rather, the data Walmart collected from the test Omniflex machines was part of the information the capital committee considered when deciding whether to approve the Omniflex Sale. *Id.* at PageID 328.

Second, Cronin argues that Walmart was "bound to the deal" between May 23 and the end of June 2017 when it requested that Kaivac "provide it with mockups of the machine in Walmart Pantone blue and by adding a spark logo" and order "customized Kaivac equipment." Doc. 48, PageID 778. He says that "[t]he offer to buy occurred when the new tank color and logo inclusion was negotiated and the production schedule for 3900 units was planned on or about June 17, 2017." *Id.* at PageID 780. He cites Ohio's statute of frauds for the proposition that "contracts for the sale of goods specially manufactured are enforceable if the seller before repudiation is received … made either a substantial beginning of their manufacture or commitments for their procurement."[6] *Id.* at PageID 779 (citing Ohio Rev. Code § 1302.04(C)(1)).

Ohio Rev. Code § 1302.04(C)(1) is only an exception to the writing requirement under Ohio's statute of frauds. It does not itself create a contract; that exception clarifies that it applies only if the contract "is valid in other respects." Thus, there has to be an actual binding agreement first for that exception to the statute of frauds to come into play. No such agreement existed when Walmart requested Kaivac order custom parts—to the contrary, Walmart was asking Kaivac to "pre-buy" the Walmart-branded parts with "no guarantee's." Doc. 48-11, PageID 929.

---

[6] As noted above, the Supplier Agreement provides that Arkansas law governs disputes between Kaivac and Walmart related to sales, so it is questionable whether Ohio law would apply in an action by Kaivac to enforce a sales contract with Walmart.

13

Finally, Cronin points to Kaivac's request to increase its line of credit with Fifth Third as evidence that Walmart contracted with Kaivac for the Omniflex Sale before August 3, 2017. Cronin argues that Kaivac represented to Fifth Third in July 2017 that it was "getting a deal from Walmart" when Kaivac told Fifth Third that Walmart was "emotionally invested" in the Omniflex machines and that Kaivac's only risk was if Walmart canceled prematurely during the rollout process. Doc. 48, PageID 782.

Cronin's argument is belied by the fact that Fifth Third did not increase Kaivac's line of credit until August 25, 2017—the same day Walmart's capital committee approved the budget for the Omniflex Sale. And none of Kaivac's communications with Fifth Third suggest that Kaivac had a binding agreement with Walmart before August 3, 2017. To the contrary, Kaivac indicated to Fifth Third that Walmart would not "be locked into a contractual obligation" to buy the 3,900 Omniflex machines from the start and that the "the purchase orders will be the only method of contract per say [sic]." Doc. 42-6, PageID 457. As of August 22, 2017, Fifth Third was still waiting on "'official word' that Wal-Mart has signed off on the order[]", and told Kaivac that it "will need the PO after the loan has closed and once it is available." Doc. 42-7, PageID 460. And Kaivac's statement to Fifth Third regarding the risk of Walmart's premature cancellation was in reference to the Supplier Agreement's cancellation provision which Walmart could invoke only *after* it had issued a purchase order to cancel; the fact that Kaivac was identifying risks it would face after Walmart issued purchase orders does not suggest that Kaivac had a binding sales agreement with Walmart before that point.

Accordingly, Kaivac's Motion for Summary Judgment is **GRANTED**.

## IV. CONCLUSION

For the reasons stated, the Court **GRANTS** Kaivac's Motion for Summary Judgment. (Doc. 41) and **DENIES** Cronin's Motion for Leave to File a Sur-Reply (Doc. 52). The Court **ORDERS** the clerk to **ENTER JUDGMENT** and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

September 22, 2025

Jeffery P. Hopkins
United States District Judge